UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO.: 3:10-CV-167-DCK

| | |
|---|---|
| KENNETH S. WILLIAMS, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> BIMBO FOODS BAKERIES ) <br> DISTRIBUTION, INC., ) <br> ) <br> Defendant. ) <br> _____ ) | PRELIMINARY <br> INJUNCTION ORDER |

**THIS MATTER IS BEFORE THE COURT** on the "Plaintiff's Motion For Preliminary Injunction" (Document No. 6) filed April 21, 2010. The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and this motion is now ripe for disposition.

After careful consideration of the record, the motion, the affidavits and declarations submitted by the parties, the parties' briefs and submitted legal authorities, and the oral arguments of counsel at a motion hearing on May 6, 2010, the Court finds as follows:

## FINDINGS OF FACT

1. In August or September, 2002, Plaintiff Kenneth S. Williams ("Williams" or "Plaintiff") purchased distribution rights to deliver baked goods in a particular, identified area.

2. On September 2, 2002, Williams entered into a Distribution Agreement (the "Agreement") with George Weston Bakeries Distribution Inc. ("GWBD").

3. On January 1, 2009, GWBD changed its name to Bimbo Food Bakeries Distribution, Inc. (hereinafter "BFBD"). As a result, BFBD is now obligated under the Agreement.

4. Williams is an independent contract distributor referred to in the industry as an "independent operator" or an "IO" and owner of his distributorship also referred to as a distribution route. Williams is not BFBD's employee.

5. Article 8 of the Agreement sets forth the procedure and mechanism under which BFBD may terminate the Agreement. Specifically, Section 8.1 states as follows:

> §8.1 **BREACH:** Except as set forth in this Article or upon the sale or transfer of all ofthe (*sic*) DISTRIBUTOR'S Distribution Rights, this Agreement shall not be terminated or cancelled provided DISTRIBUTOR carries out the terms hereof. In the event of DISTRIBUTOR'S breach of any obligations or covenants under this or any other Agreement with [BFBD], [BFBD] may terminate this Agreement as set forth below.

6. A "breach" of the Agreement can take one of two forms: a "non-curable" breach or a "curable" breach. Section 8.2 of the Agreement defines a non-curable breach to include any breach of the Agreement by the Distributor that "involves criminal activity or fraud, threatens public health or safety, or threatens to do significant harm to [BFBD], its affiliates, its operations, its trademarks or commercial reputation." In the event of a non-curable breach, BFBD may terminate the Agreement immediately upon written notice and distributor shall have no right to cure.

7. A curable breach is defined as any breach of the Agreement by the Distributor "other than [a non-curable breach]." In the event of a curable breach, BFBD must give the distributor three (3) business days written notice within which to cure the breach.

8. Section 11.4 of the Agreement states that the Agreement may be amended or modified only by a writing signed by both parties.

9. BFBD contends that it implemented an Anti-Violence Policy, which BFBD contends has been continuously and conspicuously posted in the Charlotte Depot. The policy is in the form of a notice which states as follows:

> Any actual or threatened incident of violence, including, without limitation, assault, fighting and threats, on or off the premises of a George Westin Bakeries Company, whether or not personal injury or property damage occurs, shall constitute a non-curable breach of your Distribution Agreement and your Distribution Agreement will be terminated.

10. The Distribution Agreement requires BFBD "to accept and give full credit for any damage or off code Product which is not damaged or off code by reason of [Williams'] negligence, and which has been promptly returned in accordance with [BFBD's] then current stale and damage and return policy." See Distribution Agreement Section 3.2.

11. Plaintiff contends that in approximately December 2009, BFBD stopped giving him credit for damaged product, despite the lack of any negligence on his part. Williams further contends that BFBD is charging him for product he has not received on days that he does not retrieve product from the depot.

12. Williams says he has asked BFBD on numerous occasions to explain and/or correct the erroneous charges listed on his settlement statement.

13. BFBD denies William's claims.

14. On Friday, April 2, 2010, Williams says he contacted Russ Tompkins ("Tompkins"), BFBD's area supervisor, to inquire about charges he says are erroneous and

improper. Williams contends that BFBD could not and would not take any action to resolve the alleged erroneous charges. Williams also spoke that afternoon with Tom Gantt ("Gantt"), BFBD's Charlotte Regional Sales Manager.

15. In the early morning hours of Saturday, April 3, 2010, Williams arrived at the BFBD Distribution Center to purchase and pick up product for his Saturday deliveries to his customers. At approximately 12:30 a.m., Tompkins knocked on the window of Williams' truck and asked Williams to come into the Distribution Center to have a conversation with himself and Gantt.

16. At approximately 1:15 a.m., Williams went into Gantt's office. Gantt asked Williams to sit down; Williams declined. Williams and Gantt had a discussion wherein Williams accused BFBD of stealing his money and acting in a dishonest fashion. There is a factual dispute between the parties regarding whether Williams waived his finger in Gantt's direction and/or threatened Gantt. Williams denies any such action. There is no dispute that Williams used profanity while talking with Williams.

17. The conversation became heated and quickly ended when Gantt asked Williams to leave the depot. Williams contends he was told to leave the depot and was told he could not return. Gantt denies telling Williams he was not permitted to return.

18. Gantt contends he attempted to hand Williams a written notice identifying a non-curable breach. Although Williams admits that Gantt "flipped over a letter on his desk" and "told Williams that [it] was a breach letter [while Gantt] picked it up and held it" Williams denies that Gantt attempted to hand him the document, or that he refused it.

19. Williams did not pick up any product between the early morning, April 3, 2010 meeting and the Temporary Restraining Order issued by the Honorable Richard D. Boner in Mecklenburg County Superior Court on April 13, 2010.

20. On Thursday, April 8, 2010, Williams received a letter from Gantt. The letter was sent via certified mail and is dated April 2, 2010. Although the letter indicates that it was "hand delivered and [sent by] overnight mail", it appears to have been mailed on April 5, 2010 and delivered to Williams on April 8, 2010.

21. The body of the letter states the following, in its entirety:

> On April 2, 2010, you engaged in unprofessional conduct by directing verbal obscenities at a BBA District Manager and subsequent to myself as Regional Manager. You actions constitute a breach of your Distribution Agreement with BFBD Foods Bakeries Distribution Inc. ("BFBD") (formerly George Westin Bakeries Distribution, Inc.".
>
> According to the terms of your Distribution Agreement, you have three days to cure the breach. If you do not, we will take appropriate action under the Distribution Agreement.

22. Upon receipt of the letter, Williams believed that his Distribution Agreement was not terminated for an alleged "non-curable breach," but rather had three days to cure the alleged breach.

23. After receiving the letter, Williams prepared to pick up product and make deliveries that night. At approximately 1 a.m. on Friday, April 9, 2010, Williams attempted to pick up product. The warehouse manager, however, told Williams that "he had to leave." Williams left without controversy, and without product.

24. On April 9, 2010, at approximately 11:15 a.m., Williams received a second letter from Gantt. This letter is dated April 6, 2010. Gantt refers to an April 2, 2010 argument and refers to the altercation as a "non-curable breach" and grounds for terminating the Distribution Agreement immediately. The letter states as follows:

> On April 2, 2010, you directed verbal obscenities and threats at two sales representatives of BFBD Foods Bakeries Distribution, Inc. ("BFBD"), formerly George Westin Bakeries Distribution, Inc. Your threats have put these representatives in fear of their and the public safety. You actions constitute a non-curable breach of your Distribution Agreement with BFBD.
>
> Additionally, since April 3, 2010 you have failed to service the Outlets in your Sales Area. Your failure constitutes a breach of your Distribution Agreement and threatens significant harm to BFBD, its trademarks, business and commercial reputation operations.
>
> Based on these separate and independent grounds, your Distribution Agreement is terminated effective immediately.

25. Gantt's April 6, 2010 letter further states that Williams had "90-days to sell [his] distribution rights to a qualified purchaser approved by BFBD according to [his] Distribution Agreement" or if Williams failed to secure a qualified buyer after 90-days "BFBD [would] market and sell the rights to [his] account."

26. On April 13, 2010, Williams filed suit against BFBD in Mecklenburg County Superior Court, seeking money damages and injunctive relief prohibiting BFBD from interfering with Williams' distribution business.

27. The Honorable Richard D. Boner heard Williams' Motion for a Temporary Retraining Order. Williams was represented by John R. Buric. BFBD was given timely

notice of the Temporary Restraining Order hearing and was represented at the hearing by Deborah L. Edney.

28. After argument, Judge Boner ruled that he would "enter a TRO today that prohibits [Williams] from being required to sell the route and prohibits GWBD [BFBD] from selling the route..." Judge Boner further ordered that Plaintiff was not to go on the BFBD property, but that Plaintiff would be permitted "to send a representative on to the property to pick up the goods." Judge Boner placed "on hold" BFBD's directive that Williams had ninety days to sell the route or BFBD would sell it for him.

29. Before Judge Boner entered his written Temporary Restraining Order, BFBD removed the action to this Court. The parties nevertheless agreed to abide by Judge Boner's oral Order until such time as this Court had an opportunity to hear and rule upon Plaintiff's Motion for a Preliminary Injunction.

30. Defendants contend that Williams breached Section 8.2 and/or 8.3 of the Agreement.

Based on the foregoing findings of fact, the Court makes the following:

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this dispute. The parties have consented to the jurisdiction of the undersigned Magistrate Judge who thereby has authority to enter this Preliminary Injunction Order.

2. A Preliminary Injunction should be entered upon the Plaintiff showing that: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equity tips in his favor, and (4) an injunction

is in the public interest.  See Real Truth About Obama v. Fed. Election Comm, 575 F.3d 342, 345 (2009); Fed.R.Civ.P. 65.

3. The Distribution Agreement requires Defendant to articulate an actual breach of the Distribution Agreement before it can determine whether the breach is curable or non-curable.  A breach of the Distribution Agreement must involve "criminal activity or fraud, threaten [ ] public health or safety, or threaten [ ] to do significant harm to [BFBD] . . ." before BFBD can declare the breach "non-curable" (except in the case of "chronic breach" which is not at issue here).

4. Similarly, BFBD must articulate a breach of the Distribution Agreement before it can determine if the breach is "curable."

5. At this stage of the litigation, BFBD is unable to show that Williams has breached any provision of the Agreement.  The use of profanity, and the waving of a finger in someone's face, if it occurred, does not appear to give rise to a threat sufficient to constitute a curable or non-curable breach of the Agreement.

6. As a result of the above, the Court concludes that Williams is likely to succeed on the merits of his claim that he did not breach the Agreement in a way that would give rise to a curable or non-curable breach.

7. As to BFBD's contention that Williams breached the Agreement by failing to service his route, the Court finds as follows:  First, Williams did not service his route because he believed he was told he was banned from BFBD's property.  Second, even if Williams failed to service his customers, there is no evidence that BFBD complied with its obligation to provide Williams with written notice of such a breach, or that BFBD allowed Williams

three days to cure that alleged breach.  BFBD cannot elevate the breach to a "non-curable" breach.  Consequently, Williams' failure to service his route is not a proper basis to issue a non-curable breach, even if BFBD's allegations are taken as true.

8. "Irreparability of harm includes the 'impossibility of ascertaining with any accuracy the extent of the loss'" Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc., 550 F.2d 189, 197 (4th Cir. 1977)(quoting Foundary Servs., Inc. v. Beneflux Corp., 206 F.2d 214, 216 (2d Cir. 1952), partially receded on other grounds by Real Truth, 575 F.3d 346-47)  If BFBD is permitted to terminated Williams' Distribution Agreement and force him to sell his distribution rights, or sell them for him after ninety days, in the undersigned's view Williams is likely to suffer irreparable harm.

9. In this Court's view, it would be difficult, if not impossible for Williams to articulate and set forth with any specificity, the damages he would sustain were BFBD permitted to force a sale or sell the route for him.

10. Williams owns his distribution route.  He paid for it.  To force him to sell it under a strict time constraint, or worse, to take the route and sell it for him, would be a significant harm to Williams.  If the Court were not to enter this Preliminary Injunction and the route were taken from Williams and sold, Williams would lose his livelihood.

11. Conversely, if the Court grants Williams' request for an injunction, the Court finds that BFBD is unlikely to suffer harm.  The route would be serviced, and at most, BFBD would be required to deal with an individual it does not like.

12. Based on the facts presented thus far, the Court determines that the balance of equities tips in Plaintiff's favor and supports the issuance of an injunction.

13. Enforcing valid contracts and repudiating a party's effort to avoid contractual obligations is in the public interest. Williams has a contractual right to own and operate his route. BFBD is attempting to terminate Williams' Distribution Agreement and force the sale of Williams' business, when BFBD cannot point to any conduct by Williams that constitutes a breach of the Agreement. Enjoining BFBD's efforts to terminate the Agreement absent a showing of any breach, is in the public interest.

14. The purpose of a Bond is to set aside sufficient funds to compensate the party against whom a Preliminary Injunction Order is entered. In the event that after a trial on the merits of this case, it is determined that Williams in fact breached the Agreement justifying BFBD's actions, a One Thousand Dollar ($1,000.00) Bond should be sufficient to compensation BFBD for its loss.

**IT IS THEREFORE ORDERED** that "Plaintiff's Motion for a Preliminary Injunction" (Document No. 6) shall be **GRANTED**. Until the ultimate trial of this case or further Order of this Court, whichever occurs first, the Court Orders as follows:

> 1. BFBD's attempt to terminate Williams' Agreement (for a curable or non-curable breach) for the reasons cited in both letters BFBD delivered to Williams and referenced above, is hereby set aside. Williams' Agreement is not terminated and Mr. Williams has all rights and obligations set forth in the Agreement;
>
> 2. BFBD's requirement that Williams sell his route within ninety days is hereby set aside. Williams shall have access to the Distribution Center, except as set forth in Paragraph 4 below, to

purchase and pick up product and to return product. Williams shall fully comply with all obligations required of him as set forth and in accordance with the Agreement;

3. The parties are hereby ordered to refrain from making any statements that would put the other party in a bad light. The parties shall not make any disparaging comments against each other. Should either party violate any provision of this Order, but specifically this provision, they will be subject to the contempt powers of this Court;

4. Until further Orders of this Court, Williams shall be permitted access to and on BFBD's property as set forth in Paragraph 2 except that Williams shall refrain from entering the front office, unless expressly invited there by BFBD representatives. Williams is permitted to talk with any BFBD representative necessary to operate his business. In the event he has any questions about his settlement, returns or any other issue not related to his daily pick-up and drop-off, Williams shall direct all questions and concerns to Russ Tompkins, and if Tompkins is not available, to Ken Coble;

5. Both parties shall treat each other with respect and courtesy;

6. Williams and BFBD shall comply with the terms and conditions set forth in the Agreement;

7. BFBD shall allow Williams to pick-up his product at 12:30 a.m.;

8. The relief to Plaintiff set forth in Paragraphs to and including 6 above, shall be conditioned on Plaintiff posting a Bond with the Clerk of Court, in the amount of One Thousand Dollars ($1,000.00).

**SO ORDERED**.

Signed: May 17, 2010

David C. Keesler
United States Magistrate Judge